UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MITCHELL WALL, | ) | |
| | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | Civil No. 05-53-P-C |
| | ) | Criminal Nos. 00-77-P-C & 00-78-P-C |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent | ) | |

## RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION AND ORDER ON MOTION TO STAY

Mitchell Wall has filed a motion[1] pursuant to 28 U.S.C. § 2255 seeking relief from his convictions and sentences after two jury trials, one on a charge of distributing cocaine the use of which resulted in the death of another and a second on a charge of Medicaid fraud involving Oxycontin. Wall presses a laundry list of ineffective assistance claims and four other grounds,[2] all of which mostly revolve around his conviction and life sentence on the cocaine charge. This 21 U.S.C. § 841(b)(1)(C) charge required the United States to prove that Wall distributed cocaine "after a prior conviction for a felony drug offense has become final" and "that death or serious bodily injury results from the use of such substance." Also pending is Wall's motion to stay these proceedings (Docket No. 23), until he completes his efforts to challenge three state court convictions, one of which formed the basis for his § 841(b)(1)(C) conviction and two of which resulted in a

---

[1]     Wall actually filed two 28 U.S.C. § 2255 motions– 05-53-P-C and 05-54-P-C – one for each of his criminal cases and they were consolidated under 05-53-P-C.

[2]     As the United States suggests, these claims have questionable 28 U.S.C. § 2255 viability as Wall did not raise them on direct appeal.

more severe federal sentence on the Oxycontin conviction.   For the reasons below I **DENY** Wall's motion to stay and I recommend that the Court **DENY** Wall 28 U.S.C. § 2255 relief.

*Discussion*

*Motion to Stay*

In portions of his 28 U.S.C. § 2255 pleadings Wall asserts an ineffective assistance of counsel ground against counsel who represented him on three state court charges, one of which was an element of his 21 U.S.C. § 841(b)(1)(C) conviction and two that, in view of the life sentence on that count, only had a meaningful impact on his Oxycontin sentence.   Apparently based on an understanding that he had to launch this challenge in the state courts, see Daniels v. United States, 532 U.S. 374, 376 (2001) (holding "as a general rule" that after the federal sentencing proceeding has concluded, "the individual who was sentenced may [not] challenge his federal sentence through a motion under 28 U.S.C. 2255"); United States v. Wall, 349 F.3d 18, 27 (1st Cir. 2003) ("[Wall] asserts that certain of his prior state law convictions based on guilty pleas should not have been used to calculate his sentence in these cases because he was not warned of such collateral consequences at the time he entered his pleas. It is well established that this is not a viable claim."), Wall filed his first motion to stay his 28 U.S.C. § 2255 on May 6, 2005.  Wall filed a second motion to stay "for enhancement" on May 31, 2005. Both of these motions sought a delay in the 28 U.S.C. § 2255 proceedings so that Wall could have additional time for a collateral challenge of his prior state convictions. Both motions were dismissed on June 2, 2005, because there did not "appear presently to be any properly filed state post-conviction proceeding."  In that order I also indicated that

2

there was nothing in the record that would suggest that Wall has proceeded with the sort of due diligence that would support a stay of these 28 U.S.C. § 2255 proceedings.

In his first stay request, Wall represented that he had filed a motion for post-conviction review of state charges in Maine Superior Court on February 14, 2005. The United States' motion for summary dismissal attached a copy of an order of the state court, dated May 11, 2005, that dismissed the collateral challenge because it was improperly filed pursuant to Maine Rule of Criminal Procedure 67(b). The order, entered by a Maine Superior Court Justice, expressed confusion as to which state convictions were being challenged and ordered Wall to comply with Rule 67(b), which requires a petitioner who "desired to attack the validity of criminal judgments arising from two or more trials or plea proceedings or two or more post-sentencing proceedings...[to] do so by separate petitions." The order also indicated that Wall's initial state motion for post-conviction relief was potentially time-barred pursuant to 15 M.R.S.A. § 2128(6). It cautioned Wall that "it is likely that the one-year statute of limitations has run and even properly filed petitions for postconviction review relating to these underlying convictions may be time barred."

The attachments to Wall's latest 28 U.S.C. § 2255 stay request demonstrate that Wall revised and resubmitted three motions for state post-conviction review on May 30, 2005. He also filed a supporting affidavit in state court and a request that the state statute of limitations period be equitably tolled. On June 20, 2005, Wall filed with this court the pending motion to stay arguing that he has corrected and filed the necessary paperwork with the state courts, and thus, was entitled to a stay of this § 2255 proceeding. In response to the United States' opposition to the motion to stay Wall attaches a copy of a

post-conviction assignment order.  Therein the court notes that under the Maine post-conviction statute Wall has a year from the date of the imposition of his federal sentence to file for post-conviction relief.  The court then observes:

> Post-conviction petitions are to be viewed with "liberality" and summary dismissal is appropriate only if "it plainly appears from the face of the petition and any exhibits annexed to it that the petition fails to show subject matter jurisdiction or to state a ground upon which post-conviction relief can be granted."  Smith v. State, 479 A.2d 1309, 1311 (Me. 1984); M. E. Civ. P. 70(b).  Therefore, because this court cannot determine from the face of the petition whether the statute of limitations has expired, the matter will be assigned to the regular criminal docket.  However, the grounds that are unrelated to the indirect impediment of an alleged federal enhancement (i.e. limited mental capacity) clearly fall outside the one – year statute of limitations.  14 M.R.S.A. § 2128(5)(A).

(Post-Conviction Assignment Order at 2-3.)

It appears that Wall's one-year under Maine law began to run after the imposition of his July 2, 2002, sentence, and would have expired on July 1, 2003.  Wall did not file his initial state post-conviction petitions until January 23, 2005.  It seems unlikely to my eye that the post-conviction court will determine that Wall is entitled to equitable tolling, but that obviously remains to be seen.

The immediate question for this court is should it stay this proceeding and await that determination.  The United States cites Johnson v. United States, __ U.S. __, 125 S. Ct. 1571 (2005)  for the proposition that Wall had to act "diligently to obtain the state-court order vacating his predicate conviction" in order to be entitled to have these proceedings stayed while he completes his state post-conviction efforts.  Johnson had, prior to bringing his challenge to his Armed Career Criminal Act (ACCA) status in his § 2255 motion, successfully brought a post-conviction proceeding in the state courts and actually succeeded in getting seven of his predicate convictions overturned. See Johnson,

125 S.Ct. at 1576.  Yet, while Johnson won one battle concerning a § 2255¶ 6 gate-keeping provision, id. at 1577 ("We agree with Johnson that the state-court vacatur is a matter of fact for purposes of the limitation rule in the fourth paragraph), he ultimately lost the ACCA war because the Supreme Court concluded that Johnson had not challenged his state court convictions with due diligence, id. ("But we also hold that the statute allows the fact of the state-court order to set the 1-year period running only if the petitioner has shown due diligence in seeking the order.").  The Supreme Court let his ACCA sentence stand even though several of the predicate offenses had been invalidated.

Wall responds to the United States' opposition to the motion to stay by correctly pointing out that Johnson was a case that implicated 28 U.S.C. § 2255 ¶ 6(4) and Wall has filed a petition within the § 2255 ¶(1) statute of limitation period. With respect to his diligence, Wall explains that he was awaiting the results of his direct appeal which contained a challenge to the use of his prior convictions.  This appeal was decided May 29, 2004.  This 28 U.S.C. § 2255 motion was filed March 21, 2005.  He also argues that it took him eight months of research in the prison library to figure out how to proceed.    In Johnson the United States Supreme Court reasoned apropos Johnson's lack of due diligence:

> Although Johnson knew that his conviction subjected him to the career offender enhancement, he failed to attack the predicate for enhancement by filing his state habeas petition until February 1998, more than three years after entry of judgment in the federal case. Indeed, even if we moved the burden of diligence ahead to the date of finality of the federal conviction or to AEDPA's effective date two days later, Johnson would still have delayed unreasonably, having waited over 21 months. Johnson has offered no explanation for this delay, beyond observing that he was acting pro se and lacked the sophistication to understand the procedures. But we have never accepted pro se representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness, and on this record we think

> Johnson fell far short of reasonable diligence in challenging the state
> conviction. Since there is every reason to believe that prompt action would
> have produced a state vacatur order well over a year before he filed his
> § 2255 petition, the fourth paragraph of the § 2255 limitation period is
> unavailable, and Johnson does not suggest that his motion was timely
> under any other provision.

125 S. Ct. at 1582. This discussion does not provide definitive guidance as to where the tipping point is between a reasonable delay after a federal conviction becomes final[3] and one that is temporally unreasonable. See Johnson, 125 S. Ct. at 1579 (Kennedy, J. joined Justices Stevens, Scalia, and Ginsberg, dissenting as to the determination that there was a due diligence requirement apropos § 2255 ¶6(4)).

According to the state post-conviction assignment order, Wall's challenge to the state court drug conviction upon which he was indicted for the federal cocaine offense is that his plea to that 1993 charge was not willing and knowing because he did not understand the consequence this conviction would have in relation to federal sentence enhancements and immigration laws and because he had limited mental capacity.[4]  These challenges are in the same league as those brought by the 28 U.S.C. § 2255 movant in Daniels.  In Daniels the Court extended Custis v. United States, 511 U.S. 485 (1994) which held that a defendant facing ACCA sentencing could not collaterally attack the validity of the previous state conviction in his federal sentencing proceedings.  Daniels held, in an opinion authored by Justice O'Conner joined by four other Justices, that, "as a general rule," these claim could not be brought in a 28 U.S.C. § 2255 proceeding:

---

[3]    Johnson does not even make it clear whether or not the court should look to the date of sentencing or the date that a conviction becomes final.

[4]    With respect to the merits (as opposed to the questionable timeliness) of the first ground, the federal and state precedents do not weigh in Wall's favor. See, e.g., Steele v. Murphy, 365 F.3d 14, 17 & n.1 (1st Cir. 2004) (collecting federal cases on collateral consequences); Aldus v. State, 748 A.2d 463, 469 -71 & n.6 (Me. 2000) (discussing without deciding whether immigration law is a collateral or direct consequence, but favorably citing the proposition that future federal sentence ramifications is collateral). As to the second ground's merits Wall will have a large burden indeed to prove more than ten years later that he was not competent to plead to the 1993 charge.

> If ... a prior conviction used to enhance a federal sentence is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), then that defendant is without recourse. The presumption of validity that attached to the prior conviction at the time of sentencing is conclusive, and the defendant may not collaterally attack his prior conviction through a motion under § 2255. A defendant may challenge a prior conviction as the product of a <u>Gideon</u> violation in a § 2255 motion, but generally only if he raised that claim at his federal sentencing proceeding. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982) (holding that procedural default rules developed in the habeas corpus context apply in § 2255 cases); <u>see</u> <u>also</u> <u>Reed v. Farley</u>, 512 U.S. 339, 354-55 (1994).

532 U.S. at 382-83. Daniels challenged his federal sentence, as does Wall, on the grounds that his prior state convictions were the products of inadequate guilty pleas,[5] and Wall, like Daniels, "could have pursued his claims while he was in custody on those convictions." <u>Id.</u> at 384. After all, this 28 U.S.C. § 2255 motion is a vehicle to challenge the propriety of Wall's conviction and sentence, and as at the time of trial and sentencing those state convictions were (and to this date still are) final and valid convictions, there was no constitutional impropriety in the jury or the judge treating them as such. "We have already determined in <u>Custis v. United States</u>, 511 U.S. 485 (1994)," Justice Scalia noted in his <u>Daniels</u> partial concurrence, "that a sentencing court does not violate the Due Process Clause by imposing a sentence enhanced by prior, purportedly tainted, convictions, unless the taint is the result of a <u>Gideon</u> violation. It follows ineluctably that § 2255 does not establish any right to challenge federal sentences based on their enhancement by stale, non-<u>Gideon</u>-tainted, convictions." <u>Daniels</u>, 532 U.S. at 385-86 (Scalia, J. concurring in part). <u>See</u> <u>also</u> <u>Johnson</u>, 125 S.Ct. at 1579 (observing that it is "highly doubtful that in § 2255 challenges to enhanced sentences Congress would have meant to start the period running under paragraph four on the discoverability date of facts

---

[5]       Daniels also claimed that counsel in the state court proceedings was ineffective.

that may have no significance under federal law for years to come <u>and that cannot by</u> <u>themselves be the basis of a § 2255 claim</u>, citing <u>Daniels</u>, 532 U.S. at 376) (emphasis added).

I recognize that Wall's case is different from that addressed in <u>Daniels</u> in that Wall has state post-conviction proceedings pending and evidence that there will at least be some treatment of his claim by the state courts. And Wall's motion is different from the 28 U.S.C. § 2255 motion brought by defendants only raising claims concerning predicate offenses, as Wall has multiple claims in his motion that must be brought within the § 2255 ¶ 6(1) year if he wishes to pursue them. Accordingly, it is not as simple as awaiting the resolution of the state post-conviction petition and then, if successful, proceeding under § 2255 ¶ 6(4). [6] However, in my view it would contravene the holding of <u>Daniels</u> to employ a stay and abeyance approach vis-à-vis Wall's 28 U.S.C. § 2255 motion to allow him to pursue claims that he cannot bring in a § 2255 ¶ 6(1) motion.

I also acknowledge that it is not clear from the opinions in <u>Daniels</u> what, if any thing, would be Wall's recourse once this Court adjudicates the grounds in the present 28 U.S.C. § 2255 motion (as I feel it must) and then, down the line, Wall does have success in challenging his conviction(s) in the state courts or through a 28 U.S.C. § 2254 petition. This open question was a concern of the Justices in <u>Daniels</u>. Without suggesting how such a motion would be greeted, if Wall was successful vis-à-vis the predicate offense for his conviction under 21 U.S.C. 841(b)(1)(C), he could attempt to return to federal court

---

[6]     In a way Wall's quandary is not unlike the 28 U.S.C. § 2254 petitioner's in <u>Rhines v. Weber</u>, __ U.S. __, 125 S. Ct. 1528 (2005) who was asking the court for a stay and abeyance of his already filed 28 U.S.C. § 2254 'mixed' petition so he could finish exhausting his unexhausted claim without sacrificing his already exhausted grounds which were timely under 28 U.S.C. § 2244(d)(1)(A), the § 2254 equivalent to § 2255 ¶6(1). However, the Supreme Court's tolerance of a stay and abeyance procedure vis-à-vis unexhausted § 2254 claims is not, in view of <u>Daniels</u>, something a majority of the Court would likely approve over the United States' objection apropos § 2255 motions.

with a second or successive motion, arguing under 28 U.S.C. § 2255 ¶ 8(1) that his success in the state court in challenging those convictions is "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found" Wall guilty of the 21 U.S.C. 841(b)(1)(C) offense. See Daniels, 532 U.S. at 383-84 ("We recognize that there may be rare cases in which no channel of review was actually available to a defendant with respect to a prior conviction, due to no fault of his own. The circumstances of this case do not require us to determine whether a defendant could use a motion under § 2255 to challenge a federal sentence based on such a conviction," citing § 2255 ¶ 8(1)); but see id. at 385-87 (Scalia, J. concurring in part)(explaining why he is prevented from joining "the may be rare cases" portion of the majority opinion because of his reasoning apropos the limitations of 28 U.S.C. § 2255 review).  And even with respect to the challenges Wall undertakes vis-à-vis the state conviction which only had a meaningful impact on his Oxycontin sentence, the Daniels majority and Justice Scalia's concurrence suggest that it might be appropriate for the sentencing judge to entertain an application to reopen the federal sentence once the predicate state offence or offenses is or are successfully challenged in the state courts. See id. at 382 ("In Custis, we noted the possibility that the petitioner there, who was still in custody on his prior convictions, could "attack his state sentences [in state court] or through federal habeas review." Ibid.  If any such challenge to the underlying conviction is successful, the defendant may then apply for reopening of his federal sentence. As in Custis, we express no opinion on the appropriate disposition of such an application. Cf. ibid.").  In his part concurrence Justice Scalia argued that fundamental fairness is better

achieved in cases such as this "by holding that the rendering jurisdiction," in Wall's case
Maine, "must provide a means for challenge when enhancement is threatened or has been
imposed," id. at 387 (Scalia, J. concurring in part), which Maine does by allowing post-
conviction petitions to be filed within a year of the imposition of a sentence for a new
crime resulting in the indirect impediment.   "Such a constitutional rule," Justice Scalia
opined, when "combined with a rule that any sentence already imposed must be adjusted
accordingly, would prevent sentencing hearings from being routinely complicated by
inquiries into prior convictions, and would locate those inquiries where they can best be
conducted: in the rendering jurisdiction.") id. (emphasis added).

This bridge does not need to be crossed now.  Whether or not Wall will have
some avenue for relief vis-à-vis his federal sentences should he be successful with his
state post-conviction efforts, I conclude that it is not appropriate for this Court to hold
Wall's 28 U.S.C. § 2255 motion in abeyance.

### Merits of Wall's 28 U.S.C. § 2255 Motion

In its opinion on Wall's direct appeal, the First Circuit Court of Appeals
summarized the factual basis for Wall's conviction on the cocaine charge as follows:

> Early on the morning of September 4, 1999, Loretta Fortin was
> pronounced dead of an apparent drug overdose. She and a number of other
> individuals, including appellant Wall, had been drinking and using various
> forms of cocaine through the night in Wall's apartment in Biddeford,
> Maine. The previous afternoon, Fortin also had taken ten to fifteen
> Tylenol with codeine pills, and toxicology tests performed after her death
> showed low levels of Valium in her blood as well. Others present at Wall's
> apartment that night testified that Wall left the apartment twice to obtain
> cocaine, that Wall also bought cocaine with his own and others' money
> from two young men who came to the apartment, and that on one occasion
> he injected Fortin with a cocaine mixture. At about 4 a.m., after
> announcing that she did not feel well, Fortin went outside for fresh air and,
> moments later, collapsed. Efforts to revive her failed, the police were
> called, and the others who had been present in the apartment dispersed.

> During a search of Wall's apartment later that afternoon, police officers
> found beer cans, syringes, spoons and other drug paraphernalia.

Wall, 349 F.3d at 20.

In his direct appeal Wall challenged this Court's decision to allow the testimony from Brian Griffin concerning statements Wall made to him while they were both being detained in the Cumberland County Jail.  Wall had unsuccessfully moved to suppress the statements made to Griffin including an alleged admission by Wall to Griffin that it was Wall who had injected Fortin with cocaine.  In his appeal Wall also argued "(1) that the court improperly denied his motion for new trial based on new information that $115 in cash was not seized from his apartment, contrary to testimony of a government witness; (2) that the court improperly instructed the jury on causation in relation to Fortin's death; and (3) that the evidence was insufficient to establish that Fortin's death resulted from the use of cocaine that Wall distributed."  Id. at 21. And, in a pro se supplemental brief, Wall challenged the use of his prior convictions in setting his sentence.

### Section 2255 Claims[7]

#### A.    Ineffective Assistance Claims

Of Wall's nineteen grounds in his 28 U.S.C. § 2255 motion fifteen of these grounds are ineffective assistance of counsel claims and I have set them out under thirteen different headers below.  "An ineffective assistance claim requires the defendant- who bears the burden of proof, Scarpa v. DuBois, 38 F.3d 1, 8-9 (1st Cir.1994)-to show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's failures, the outcome would likely have been different.  Strickland

---

[7]    These claims I take from Wall's 28 U.S.C. § 2255 motion and affidavit and an addendum and statement of facts filed on March 31, 2005.

v. Washington, 466 U.S. 668, 687(1984)." Cirilo-Munoz v. United States, 404 F.3d 527,

530 (1st Cir. 2005) (quoting Cofske v. United States, 290 F.3d 437, 441 (1st Cir.2002)).

### 1. Failing to challenge casual role that cocaine had in bringing about the death of Fortin and failing to investigate the circumstances surrounding Fortin's death

Wall faults his attorney for not challenging the casual role that the cocaine had in

causing the death of Fortin.  He argues that Congress meant (in enacting 21 U.S.C.

§ 841(b)(1)(C)) that the cocaine was the direct cause of her death.  Wall faults his

attorney for not sufficiently investigating the proximate cause and for not familiarizing

himself with the case law on this question.

In a separately framed ground Wall states that he hired a private investigator and

that she talked to the kids who were at the Wall residence the night in question.  He

indicates that the kids admitted to selling cocaine at Wall's house and that they admitted

that they cut the cocaine in half with baking soda.  Defense counsel, Wall complains, did

not check into the fact that Tylenol along with Codeine can cause liver failure.  He did

not investigate the exact time when Fortin ingested the Codeine.  He did not check to see

if Fortin had any pre-existing medical problems, information which would have caused

the medical examiner to do further testing.  Counsel also did not challenge the fact that

the medical examiner did not check for commonly abused drugs.

Wall brought a sufficiency of the evidence on causation plaint before the First

Circuit.  With respect to this challenge, the Panel addressed this challenge after it

analyzed Wall's challenge to the omission of an intervening cause instruction.  The

relevant passages of the Panel's decision are:

> Appellant's remaining point, that the court improperly omitted an
> intervening cause instruction, also merits little response. Although he

points to the other drugs and alcohol ingested by Fortin, appellant identifies no evidence in the record that would permit a conclusion that another substance, rather than cocaine, was responsible for her death. The medical examiner testified that, in his opinion, the level of cocaine in Fortin's system was enough by itself to kill her. He further stated that none of the other substances she had consumed was at a level sufficient to cause her death, and it was "very unlikely" that death would have resulted from only the combination of alcohol, codeine and valium. On this record, the failure to give an intervening cause instruction was not plain error.

*D. Sufficiency of the evidence on causation*

Recognizing that a defendant faces a heavy burden in challenging the sufficiency of the evidence, see, e.g., United States v. Scharon, 187 F.3d 17, 21 (1st Cir.1999), appellant nonetheless argues that the record does not support the jury's finding that Fortin's death resulted from the use of cocaine that he distributed. In particular, he contends that the medical evidence does not show that cocaine, rather than the other substances, triggered her death.

Our previous discussion of the medical examiner's testimony largely suffices to put this contention to rest as well. Although both the medical examiner and a toxicologist identified Fortin's cause of death as "acute multiple drug poisoning," the medical examiner's explanation of the likely potency of the various substances permitted the jury to conclude that the cocaine was the significant element in the mix. Indeed, the medical examiner explicitly stated that the cocaine was "the most important or key drug," and, when asked by the prosecutor if the level of cocaine found in her blood "could stand alone as the cause of [Fortin's] death," he replied affirmatively, assuming that the surrounding circumstances were identical. This was a sufficient basis for the jury's verdict.

Wall, 349 F.3d at 25.

In these 28 U.S.C. § 2255 pleadings Wall essentially resurrects his beef with the jury's determination and argues that the medical evidence did not show it was the cocaine – as opposed to the other substance ingested by Fortin – that triggered her death.  Wall thinks that his attorney "dropped the ball" in not testing the United States' medical evidence.  In his response to the United States' opposition memorandum, Wall notes that Fortin's blood alcohol concentration was .148 but that this measurement was not taken until almost seven hours after her death.  Yet, Wall, complains, his attorney never posed

13

the question during trial of what her blood alcohol level was at the time of death. He also thinks that counsel could have challenged the government's evidence on the levels of valium and codeine as, based on the autopsy conducted seven hours after Fortin's death, the medical examiner testified that he would not have expected Fortin to die from the levels of valium, codeine, and alcohol.  While acknowledging that the cocaine "certainly did not help matters," he thinks his attorney should have found out what the levels of these substances were at the time of Fortin's death.  Furthermore, Wall challenges his attorney's failure to question the toxicologist on the effect that three drugs administered to Fortin during resuscitation efforts would have on the cocaine screening results.  He states that in her examination of the medical examiner the prosecutor asked whether these administered medications would have any affect on his opinion as to the cause of death and the examiner answered no.  Wall complains that the question is not whether these medications caused Fortin's death but whether the medications influenced the toxicologist results.[8]

In my view Wall's assertions as to what he would have had counsel do apropos the medical evidence adduced at trial do not begin to form the basis for a conclusion that counsel's performance fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 687.  As the United States points out, citing Wall's own exhibit, a letter from his first attorney to his trial attorney identifying the defense's forensic expert as Dr. Eleanor McQuillin, indicates: "Her opinions are not helpful." (See 05-54-P-C, Docket No. 2, Attach. 9.)  Wall's conjecture about what defense counsel may or may not have been able to prove by asking questions of these witnesses about what would have been

_____

[8]       Wall makes a lot of assertions about the clinical nature of these drugs that he is not competent to make.

the levels of these substance had tests been done at the time of death is akin to suggesting that counsel should have gone on a fishing expedition; it does not go far in establishing that his decision not to was constitutionally inadequate. The same holds true vis-à-vis the impact of the drugs administered at the hospital on the post-mortem tests. Wall has provided the court with no record support for the proposition that these drugs would have any impact (counter to the examiner's representation to the contrary) beyond his pure supposition that they might.

### 2. Failing to object to testimony that attributed $115 to Wall

Wall complains that counsel was not sufficiently familiar with the evidence at trial and that this resulted in his failure to object when a witness testified that $115 found in an apartment (that turned out was not Wall's) was Wall's drug money. Wall indicates that he was telling counsel at the time of trial that the money was not his.

As noted above, Wall raised in his direct appeal a challenge concerning this testimony/attribution which was the basis for his motion for a new trial. The First Circuit explained:

> The $115 was the subject of two brief questions asked of a Biddeford police officer, who identified the money and said it was found in the living room of Wall's apartment. The primary reference to the currency occurred during the prosecutor's rebuttal, when she urged the jury to consider all of the evidence of drug distribution found in Wall's apartment:
> > And there was money, remember there was $115 worth of money sitting [i]n Mitchell Wall's living room. Now the kids from Old Orchard were long gone. So think about what that money means.

Wall, 349 F.3d at 22 n.5. Two weeks after trial the United States realized that this cash had been found in another apartment. Wall then moved for a new trial and this Court denied his request finding that the police officer witness and the prosecutor had acted in good faith and that the currency "was of little significance, if any, on the ultimate

questions of whether distribution of cocaine occurred and whether Defendant committed the acts necessary to constitute distribution."  In his addendum to his motions Wall describes the prosecutor's use of the attributed $115 dollars as "the foundation of the petitioner's guilt."

The First Circuit is already on record as disagreeing with Wall on this score:

> Wall's guilt or innocence rested on whether he distributed the cocaine that resulted in Fortin's death, not on his receipt or possession of cash. His role in providing cocaine to the others in his apartment that night was the subject of extensive other testimony and evidence. Three of those present-as well as Wall himself-testified that he obtained cocaine for the group to use. In addition, drug  paraphernalia with cocaine residue was found in Wall's apartment, corroborating the witness testimony.
>
> We therefore agree with the district court that, in the context of the overall case, the evidence concerning the $115 was of minor significance. Although it allowed the prosecutor to suggest that Wall provided the drugs since he had an accumulation of cash, there was much testimony about the exchange of cash for cocaine at Wall's apartment. That the particular $115 shown to the jury was in fact seized elsewhere was thus of little consequence. In light of the extensive, much more damaging direct evidence of Wall's role in securing cocaine, the district court did not err in concluding that the evidence concerning the $115 was not material to the jury's verdict.
>
> Likewise, we reject appellant's suggestion that knowledge of the misrepresentation would materially impact the jury's assessment of the police officer's credibility, perhaps casting doubt on whether the drug-related items he identified also were mistakenly attributed to a search of Wall's home. The other items were photographed where they were found and their location thus was substantiated; the misinformation about the $115 would therefore not affect the officer's credibility on the other evidence.

Id. at 22. (footnote omitted).  With respect to Wall's argument that this Court erred in not holding an evidentiary hearing, the Panel further stressed "the limited significance of the $115."  Id.

Given that trial counsel seized on this testimonial miscue as a basis for the motion for a new trial it is hard to see how this could be a basis for an ineffective assistance

claim.  Furthermore, the First Circuit's discussion of the issue and its emphasis on the testimony's limited evidentiary impact makes it safe to say that counsel's failure to lodge a simultaneous objection to the testimony did not prejudice Wall in a way that runs afoul of Strickland.

**3.      Trial counsel's failing to be aware of the suppression hearing held prior to his appointment as Wall's counsel thereby loosing the opportunity to impact the testimony of Griffin and refusing to use reports of Griffin's interviews to impeach him**

Wall complains that his attorney failed to become aware of what transpired before he commenced representing Wall and therefore was unaware that there had been a suppression hearing as to the statements Wall allegedly made to Brian Griffin.   What has not seemed to have sunk in for Wall is that the fact that his previous attorney was unsuccessful in prosecuting that motion to suppress means that there was no ground to object to the testimony of Griffin vis-à-vis those statements.[9]

---

[9]      Apropos these statements and this Court's ruling on the motion to suppress the Griffin testimony, the First Circuit Court of Appeals reflected:

> The Sixth Amendment bars the use at trial of incriminating statements that law enforcement officers "deliberately elicit[ ]" from a defendant outside counsel's presence once the right to counsel has attached. See Massiah v. United States, 377 U.S. 201, 206(1964). Appellant argues that his statements to Griffin should have been excluded under this precedent because Griffin was acting as a government agent when he initiated the jailhouse conversations with Wall.
>
>         We disagree that constitutional error occurred for the same reasons expressed by the district court in its thoughtful response to appellant's motion to suppress, in which the court fully considered both the relevant legal principles and the particular factual circumstances. We find it unnecessary to retread the same ground, and instead simply note here our accord with the district court's pertinent conclusions: that Griffin was acting in his own interest and not at the behest of the government when he engaged appellant in conversation; that the government neither deliberately created nor exploited circumstances that would lead to incriminating statements; and that the government did not "focus" Griffin's attention on appellant, see United States v. LaBare, 191 F.3d 60, 65 (1st Cir.1999). In short, the government played no role in the happenstance meeting between the two men, and nothing in the government's prior interactions with Griffin encouraged him to elicit information from Wall on the government's behalf. To the contrary, Griffin had been told not to communicate with anyone involved in his case, and the government agents believed (incorrectly) that a segregation order preventing such an opportunity was in effect. In these circumstances, no Sixth Amendment violation occurred.

In his 'affidavit' Wall further faults his attorney for failing to recognize and utilize impeachment evidence that established, Wall asserts, that Griffin was in fact committing perjury when he testified.  He says that at trial Griffin was asked:  "Now, before having that conversation in September 2000 with Mitchell Wall had you talked to anyone else about what had happened the night of Loretta Fortin's death?"  (Sept. 11, 2001, Trial Tr. Vol. II at 226.)  To this Griffin respond, "No, I didn't."  (Id.)  Wall believes that his attorney should have impeached Griffin on this score with certain statements that Griffin made to third parties such as that Griffin was aware that Fortin was in Biddeford when she died, that Griffin had overheard while at Mercy Hospital that Shrout was present when Fortin died, and that Shrout had shot Fortin up.[10]  He thinks that if his attorney had impeached Griffin with this information then the jury would have understood that Griffin's "testimony was the product of lies and deception."[11]   He states that his attorney's failure to review this evidence or share it with Wall "prevented the defense from capitalizing on a golden opportunity – to expose both the prosecutor and Griffin as prevaricators."  "This revelation," Wall believes, "constitutes constitutionally ineffective assistance of counsel, for such a revelation almost certainly would have resulted in Movant's acquittal."

---

Wall, 349 F.3d at 21 (footnotes omitted).

[10]     Wall points to three exhibits to his affidavit, Exhibits E, F (Wall claims in his prosecutorial misconduct claim these two were never disclosed to counsel) and G.  These are investigatory reports that: John Binnette told law enforcement that he told Griffin that a woman had injected Fortin with cocaine which led to the overdose and that Griffin had heard she was in Biddeford when she died; that Griffin told agents of being at a hospital when a woman he knew was speaking to an unknown male about Bill Shrout and this conversation revealed to Griffin that Shrout was present when Fortin died and that Shrout had shot Fortin up; and another man had met Griffin at a rehab program and Griffin told this man that he had heard of Fortin's death.

[11]     Wall also believes that this demonstrates that the prosecutor did suborn the perjury of Griffin because she was privy to these reports that Griffin had been in several discussions about Fortin's death before talking to Wall.

The dates of these conversations relative to Griffin's conversation with Wall are not at all clear.  With respect to impeaching Griffin as to the fact that Wall told him of his involvement in Fortin's death would have been of minimal value if not a tactical mistake.  And <u>Strickland</u> counsels that counsel must have "wide latitude ...in making tactical decisions."  466 U.S. at 689.

**4.    Failing to investigate, to recall witness testimony, and to confer with Wall's first attorney, private investigators, and witnesses**

Wall faults his attorney for not talking with his first attorney, two private investigators, and seven named witnesses who Wall contends could have impeached government witnesses Debra Leach and Brian Griffin, thereby, Wall believes, "clearing" Wall of his conviction.

In his 'affidavit' Wall explains that his previous attorney had hired Debbie Briggs as a private investigator for the defense.  If his trial counsel had contacted Briggs, Wall contends, he would have learned that someone named Chris Carbone sold cocaine to people at Wall's apartment and was worried that he would be implicated in Fortin's death since he sold the drugs that killed her; Carbone reported that he had cut the cocaine he sold that night to half cocaine and half baking soda.  Also in the 'affidavit' Wall argues that additional prejudice flowed from counsel's failure to utilize Jencks Act materials when cross-examining Debra Leach.  Wall points to the testimony of Griffin in which he indicated that he never talked with Debra Leach about Wall's case and had met her only one time before he had met her at the Cumberland County Jail.  (Sept. 11, 2001, Trial Tr. Vol. II at 227.)  This testimony, Wall claims, required counsel to question Leach on the contents of the conversation she had with Griffin when they were at the jail.

In his response to the United States' opposing memorandum Wall faults his attorney for not carefully reviewing a report by Detective Elizabeth Coleman that would have provided a basis, Wall believes, for impeaching Debra Leach.  Wall sets forth thirteen hypothetical questions that counsel could have asked Leach to demonstrate that the cocaine dealing 'kids' from Old Orchard Beach came at Leach's behest.  Wall also thinks his attorney should have questioned Leach about her affair with Fortin's husband, about how she had been trying to get cocaine all day, and about her conversation with Brian Griffin at the Cumberland County Jail prior to the conversation between Wall and Griffin.

Wall also asserts that counsel performed inadequately at trial because he did not keep tabs on the testimony of witnesses, in particular Leach, Fortier, Powers, and Griffin.  Wall believes that if counsel had done so he could have caught them out lying.  Fortier, Wall claims, said that Wall left the house with money and returned with coke.  Yet he also said that Wall went into the bedroom with a 'kid' to purchase the coke.  Leach testified that Wall left the house with money and returned with coke but Powers testified that Wall bought coke directly off the 'kid.'  And Griffin said that Wall and Fortier met at the store and went to Wall's house.

Finally, Wall lists other "major opportunities" missed by counsel.  He should, Wall argues, have spoken with Stephanie Gerry and Michael Thurston and learned that Leach had gone to their apartment several times on September 3, 1999, to page drug dealers; have spoken with Jeanine Larson and learned that Larson had met Brian Griffin at rehab and told him what she knew about Fortin's death; and have spoken with Donna Vacari and learned that Vacari had written out a statement of what Leach told her and

20

Larson at rehab about the circumstances of Fortin's death which would be almost verbatim what Griffin later reported that Wall said happened.

These plaints by Wall about how counsel should have impeached these witnesses paint a picture more of a micro-managing client cum Monday morning quarterbacking appellant/§ 2255 movant than of an attorney making poor choices about how to handle adverse witnesses.  As this Court well knows, the evidence adduced at trial is that of witnesses -- both as to those present at the scene and those who had conversations about the Fortin death after the fact –  who were interacting in a milieu of mutual drug abuse. Contrary to how Wall perceives matters, it was not a case in which counsel  would have gained advantage by putting these little chinks in the witnesses' credibility by pointing out potential or peripheral inconsistencies in and between their testimony.  See United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005).[12]   Once again, Strickland counsels that counsel must have "wide latitude ...in making tactical decisions."  466 U.S. at 689.

---

[12]    Indeed, in a footnote, the First Circuit highlighted the testimonial evidence as follows: The testimony linked Wall to the acquisition, preparation and injection of the cocaine used by the group. For example, Debra Leach testified that Wall left the apartment at one point, after Armand Fortier gave him $50, and returned with a baggy of cocaine. According to her testimony, he later took money from Richard Powers, left briefly and again returned with cocaine in a baggy. Fortier, who testified that he gave Wall money more than once that night to buy cocaine, recalled seeing Wall prepare cocaine powder so that it could be smoked and watched Wall inject himself with the drug. Leach stated that she gave an injection of cocaine to Fortin, and then Wall mixed more of the drug and injected Fortin with it himself. Leach also testified that Wall bought cocaine from two teenagers who came into the apartment late that night. Powers testified that Wall prepared cocaine for him and Fortier after he, Powers, gave money to "the kid," who had been told by Wall to "stoke them up, set them up." Griffin testified that Wall told him that he supplied the cocaine used that night and that he injected Fortin. At trial, however, Wall denied injecting Fortin, but admitted on cross-examination that he agreed to get cocaine for the others. He also said, however, that he did not actually provide the cocaine to the others; they got the drug directly from the two teenagers who came to Wall's apartment. Wall, 349 F.3d at 20 n.2.

### 5.      Failure to communicate plea offer

With respect to plea offers, Wall recounts that on August 24, 2001, the United States offered (to recommend) Wall receive a seventeen-year sentence if he pled guilty and cooperated and that Wall declined this offer.  Then, after the first trial on the cocaine distribution count which resulted in a life sentence, the United States offered (to recommend) a seventeen-year plea agreement if Wall waived his right to a direct appeal and a 28 U.S.C. § 2255 motion.   It is clear that Wall believes that this plea offer was to apply to both cases against him.  In his addendum he explains that he "would have been a fool to reject [the seventeen-year] offer if it was offered especially after a conviction was already obtained with a minimum life sentence."   Wall claims that counsel never notified him of this October 4, 2001, offer.  He states that an October 5, 2001, counsel did phone him at the jail "advising him that the case would get overturned" because of the fact that the testimony by the officer/witness that $115 cash was attributable to Wall was incorrect yet counsel did not mention anything about the plea offer.

In his 'affidavit' Wall asserts that his attorney failed to advise him that the government had made plea offers both prior to and after his (first) trial.  He describes these plea offers as "drastically reduc[ing] the sentencing exposure" he would have faced. In his addendum Wall argues that the reliance on the miss-attributed $115 by the prosecution was key to linking Wall to the cocaine that killed Fortin as it was "the change" for that purchase.  He also states that the bag of money negatively impacted his credibility because he testified that he did not have any money.    Thus, with respect to why the United States would offer a seventeen-year sentence in a case in which it had secured a life sentence, Wall hypothesizes that they may have anticipated that his

conviction on the cocaine charges would be overturned on direct appeal – especially because of the discovery of the incorrect testimony attributing the $115 dollars to Wall-- which is why the prosecution insisted that Wall forfeit his right to appeal as part of the agreement.  "Secondly, and this might stretch credulity," Wall suggests, "the Government may have felt that the Movant represented the lowest form on the drug world's totem pole, and as such, did not deserve to have to spend the rest of his natural life in prison." "Finally," argues Wall, "the Government reasonably could have feared that Movant successfully would vacate the prior state conviction that would support the mandatory life sentence."[13]

However, the exhibit that Wall cites to is an October 4, 2001, fax that is a plea agreement that makes it clear that, as to the conviction on the distribution case: "21 U.S.C. § 841(b)(1)(C) mandates a **life sentence** because Wall has a prior drug trafficking conviction."  (Docket No. 5 Attach. at EEE 76-77.)[14]  Wall's construction of the plea proposal based on where the hand-written notations are made do not alter this reality; "Painting a pumpkin green and calling it a watermelon will not render its contents sweet and juicy." Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 24 (1st Cir. 2002).  In view of the mandatory statutory life sentence, it is also evident that, even if the United States had made a recommendation to the Court that Wall receive a seventeen-year sentence on both offenses, this Court would not have considered following this recommendation.

---

[13]     In his response to the United States' memorandum, Wall suggests that the United States has conceded that it offered a seventeen-year sentence plea deal on October 4, 2001, for both the cocaine convictions and the still pending Oxycontin case and that this proposal was not relayed by counsel to Wall.
[14]     The United States has filed the affidavit of Wall's trial counsel in which he avers: "[On] September 22, 2001, in the presence of the United States Attorney ..., Mitchell Wall, and a Deputy United States Marshal, I verbally told [the] Assistant United States Attorney ... that Mitchell Wall rejects the government's offer to plead guilty."  This does not assist in discerning if there was any conversation between attorney and client concerning the interstitial plea offer.

### 6.      Failing to give pretrial paperwork to Wall

Wall complains that his attorney did not give him any material to adequately prepare Wall to assist, investigate, and prepare before trial.  Wall states that he did not receive any of this paperwork until he was given it by his appellate lawyer. In his response to the United States' opposition memorandum Wall argues that it does not matter if there was a strategic reason for not sharing the paperwork with him, this violated the constitution and "is per se unreasonable."

In his addendum Wall contends that on December 17, 2001, Wall and counsel appeared before this court on a motion by his attorney to withdraw and counsel admitted that Wall was mad at him because he had two big boxes of material at his office that he would not give to Wall.  Wall states that these boxes contained evidence from Wall's trials along with reports, interviews, statements, proffers, proposed plea agreements, and other related material for his two cases.  Wall believes if he had had access to this material he could have assisted in his own defense.[15]

The transcript of the hearing on this motion to withdraw reveals that counsel did represent that he had files in his office that he had not given to Wall because the Court had yet to rule on the motion for a new trial.  (See Dec. 17, 2001, Tr. at 3.)  Counsel indicated that he would be glad to give these to Wall the next day.  (Id.)  In his representations to the Court, when asked to tell the Court succinctly why he was unhappy with trial counsel, Wall pointed to the fact that counsel blew off the issue of the money

---

[15]      Wall also complains that he wrote his trial counsel on January 2, 2004, and asked for materials that he might have.  In a responsive letter counsel stated that he had returned Wall's paperwork to Wall in jail when Wall indicated he did not want him to handle Wall's appeal.  Wall describes counsel's representations in this letter as "deception in correspondence."   He also charges counsel for collecting both $7000 from Wall and accepting court-appointed fees.  These concerns do nothing to advance Wall's § 2255 claims.

being misattributed to him and indicated that he felt he needed a female lawyer because he would be more comfortable with a woman.  (Id. at 4-5.)  Wall reported that he did not believe he could communicate with counsel and expressed frustration that he had tried to since he had been convicted but had no luck.  (Id. at 6-7.)  The Court followed up:

> The Court:      You mean the fact that you got convicted means your communication is ineffective?
> Mr. Wall:       Yeah.
> The Court:      Well, what else have you got for a reason?
> Mr. Wall:       I just --- it's a lot of things, I don't feel as if he adequately represented me.
> The Court:      In what way?
> Mr. Wall:       In the conspiracy trial because there's a lot of questions that I don't think he even read over my case.
> The Court:      You don't know that, do you, you just think that.
> Mr. Wall:       I think that.
> The Court:      The basic problem is you're unhappy with being convicted; right?
> Mr. Wall:       Yes, especially - -
> The Court:      Now you want a new attorney to try to undo that?
> Mr. Wall:       Yes.
> The Court:      But [trial counsel] seems to me is perfectly competent to pursue your sentencing procedures, and ultimately an appeal of the record as it now stands
> Mr. Wall:       See, I don't understand that.
> The Court:      You don't understand that.

(Id. at 7-8.)

First, Wall is incorrect in stating that it is per se unreasonable for counsel to not share all defense materials with his client.  As the United States points out, counsel could well have kept the materials out of concern for their confidentiality given that Wall was incarcerated.  Second, Wall does not identify what specifically he could have told to counsel had he been given access to the material.  It is clear from the hearing transcripts that, while Wall described a generalized discontent with counsel's effectiveness, Wall's efforts with respect to getting access to the boxes of information commenced after his

convictions.  In terms of having any impact on post-conviction determinations, the only decisions that might have been impacted by Wall's review of the papers was the pending motion for a new trial and the sentencing.  Wall has not identified what information in these materials he could have used to change the outcomes of those determinations.[16]

### 7.    Failing to adequately prepare Wall to testify

Wall asserts that his attorney did not in any way prepare him for his testimony. He asserts that as a consequence he incriminated himself and was entrapped by subsequent jury instructions.  In the addendum Wall relays that at the beginning of trial this Court told the jury that to prove distribution the prosecution had to prove that the cocaine had to be passed from one hand to another.  Wall testified and admitted that he did go to a friend's house and try to buy cocaine but that his friend was not home. When he returned to his own house he gave the money back to Fortier.  Wall also admitted that he had cooked some cocaine up but this, in Wall's view, is not distribution.  Then in the prosecutor's closing statement she emphasized that Wall was aiding and abetting because he tried to get cocaine from others and he cooked the cocaine for Rick Powers.   In her closing the prosecutor quoted Wall's instructions to the kids, along the lines that they should hook Powers up with some cocaine.  Wall also complains that the Court's instruction on aiding and abetting took Wall by surprise and defense counsel should have familiarized Wall with this legal point prior to his testimony.  These instructions were that Wall did not even have to have actual possession of the cocaine or to even be present at the death to be found guilty.   Wall further complains that the jury sent a note asking the Court to re-read the elements of distribution.  This Court, according to Wall, refused

---

[16]        Wall has no beef with appellate counsel and there is no assertion that that attorney was not given all the materials trial counsel had on the case to prepare for the appeal.

the prosecutor's request for him to re-read the aiding and abetting instruction.  Wall feels as though this Court's answer to the jury was not adequate to dispel the juries' confusion on a controlling question.

The United States asserts that his claim that counsel did not discuss the prospect of testifying with Wall is "inherently suspect."  It also points to the transcript of a pre-cocaine-trial conference of counsel (without Wall present) in which trial counsel indicates that he had just discussed the disadvantages of testifying with Wall but that Wall was intent on testifying nonetheless.  The United States does not provide record citation for this exchange and the printed transcript of the pre-trial conference has defense counsel indicating that he thinks that Wall would be taking the stand and that if he did so evidence of the predicate prior trafficking conviction could come in and if Wall did not take the stand then he would argue that there be no reference made to the conviction.  (Sept. 10, 2001, Tr. at 50-51.)  Counsel did represent that he had seen Wall on about twenty-five occasions, he was hard to represent, and that he had unsuccessfully recommended to Wall to go jury-waived.  (Id. at 51.) The Court then recessed at 8:40 a.m.  Proceedings resumed in open court with the jury sitting at 8:50 a.m. and defense counsel immediately indicated that Wall had not arrived at the Court house.  (Id. at 53), accordingly there was no chance for consultation during that recess.   After a further recess (the Court apparently waiting at least five minutes without Wall's arrival) and another conference of counsel at 9:15 a.m., the trial resumed with Wall present at 9:22 a.m.  So, I am not convinced that the record supports a conclusion that counsel had a discussion with Wall that morning about his testifying.

However, as I read Wall's claim it is not that counsel did not try to dissuade him from testifying on his own behalf, but that he did not sit down with Wall to structure his testimony in such a way that he could meet and defeat the government's evidence necessary to prove the cocaine death charge as shaped by the instructions given by the Court.  This amounts to an, unsustainable, claim that counsel was ineffective for not advising Wall on how to be evasive in his testimony or, worse, perjure himself.

**8.      Pre-trial and trial counsels' failing to file a motion to suppress apropos the search of Wall's apartment and failing to object to the introduction of syringes, spoons, and beakers**

Wall faults his pre-trial and trial counsel's failure to file a motion to suppress as to the search of his residence.  The grounds Wall identifies for such a challenge is the fact that the search occurred on September 4, 1999, but the affidavit and warrant is signed by Detective Coleman and the presiding judge on September 5, whereas the notary public signed that Coleman appeared in person on September 4.  As Wall notes, a motion to amend the search warrant was filed on September 10, 1999, on the grounds that the mistaken date was noticed after the search, and this motion was granted.  Wall contends that the September 5 date should have been brought to the judge's attention on September 4 if that was in any way possible unless the date for the search was to be September 5.  It is Wall's speculation that the September 4 search was conducted before Coleman sought the warrant on September 5.  Counsel, Wall argues, could have called the judge, Coleman, and the notary to testify at the motion to suppress.[17]  Wall states that trial counsel was particularly ineffective because he failed to file a motion to suppress even though Wall had fired his first attorney for not raising this challenge to the warrant.

---

[17]      Wall attempts to identify problems with the representations made by Coleman in the affidavit as being unsupported and contrary to what really happened but his arguments on this score are patently frivolous.

In another ground Wall laments his attorney's failure to object to the introductions of syringes, spoons, and beakers at his "death trial."  He believes that this evidence was irrelevant to the facts of the case and the items were illegally obtained by the government. He feels like he was discriminated against and that he was not given a fair trial.

Both these assaults fail for the simple reason that counsel would have no good faith basis for pressing a motion to dismiss solely on an argument that this Court should have treated the incorrect dates on the warrant – promptly and formally amended -- as invalidating the September 4 search.  See United States v. White, 356 F.3d 865, 869 (8th Cir. 2004); United States v. McKenzie, 446 F.2d 949, 954 (6th Cir. 1971);  cf. United States v. Bonner, 808 F.2d 864, 866 (1st Cir. 1986). And Wall has pointed to no evidence in support of the proposition that the warrant was actually obtained after the search was conducted.  United States v. McGill, 11 F.3d 223, 225 (1st Cir.1993) ("When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing.  In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets.")(citations omitted). Accordingly, the failure to pursue a fruitless motion to suppress or object to the admission of the evidence thereby obtained on the ground that it was the fruit of an illegal search did not violate Wall's Sixth Amendment right to counsel.

**9.      Failing to raise a diminished capacity claim during the sentencing**

Section 5K2.13 of the United States Sentencing Guidelines provided at the time of Wall's sentencing:

A sentence below the applicable guideline range may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.

U.S.S.G. § 5K2.13 (1998 ed.).

Wall complains that his attorney during sentencing (his third attorney) should have raised a diminished capacity claim at sentencing because Wall only has an I.Q. of 80 and is borderline mentally retarded. According to Wall, sentencing counsel told Wall that he was going to raise this issue but he never did. In his addendum Wall points to his sentencing transcript of April 8, 2002, during which proceeding counsel articulated his impression that there was a mental problem in Wall's past and his understanding that he could not get a downward departure from a statutory minimum sentence. Counsel explained that Wall might want him to file a motion for a diminished capacity downward departure. Yet, Wall complains, counsel though aware of Wall's desire, never brought the subject up again. He asks why counsel would not at least try for such a departure on the Oxycontin conviction which carried no statutory minimum. Wall points out that he was diagnosed with three mental conditions: poly-substance dependency, post-traumatic-stress disorder, and anti-social personality disorder. He claims that counsel informed

Wall that Wall had to tell the court that he was competent or this Court would send Wall away forever where he would be injected with drugs and become a zombie.[18]

At the first pre-sentencing conference Wall's attorney did indeed indicate that Wall might wish to seek a departure as to the Oxycontin case (Apr. 18, 2002, Tr. at 47) and the prosecutor promptly raised the competency hearing as evidence probative of whether or not he would be entitled to such a departure (id.). At the second pre-sentencing conference it became clear that Wall's status (or not) as a career offender based on the predicate offenses was the tail that wagged the dog as to both cases. (June 6, 2002, Tr. at 54-57.)[19]

The United States responds to the ground by pointing out that the life sentence for the cocaine death conviction was mandatory. It also points out that Wall had a competency hearing on July 19, 2001, after which the Court found him competent to stand trial. (See Crim No. 77-P-C, Docket No. 35.) It says the evidence at that hearing indicated that Wall was a malinger who intentionally tried to distort evidence of his psychiatric state and that, therefore, informed counsel could reasonably decide not to interpose Wall's mental state as a ground for leniency. And the United States further argues that a departure under United States Sentencing Guideline § 5K2.13 would not have been ordered even had sentencing counsel sought it because there was no evidence that Wall committed the crimes while suffering from a reduced mental state and that, even if there were such evidence, Wall's voluntary use of drugs and public safety

---

[18]     Wall also thinks that counsel should have pressed an argument that Wall was not criminally responsible at the time of the crimes but there is no basis in this record to even begin discussing such a claim.

[19]     Despite this realization, this Court decided it was best to go ahead and make a drug quantity determination just in the event the case's landscape changed on appeal or in a 28 U.S.C. § 2255. (Id. at 58-60.)

concerns dictated against the departure.  In my view the United States has raised three

persuasive points, and, I add, this Court as the sentencing court is in a unique position to

determine whether or not Wall was prejudiced by counsel's decision to desist from

seeking the departure.  See McGill, 11 F.3d at 225 (observing that, when, a "petition for

federal habeas relief is presented to the judge who presided at the petitioner's trial, the

judge is at liberty to employ the knowledge gleaned during previous proceedings and

make findings based thereon without convening an additional hearing").

### 10.    Failing to object to the 'constructive amendment 'of the indictment, to instructions, and to the prosecution's closing

Wall asserts that counsel should have objected to the 'constructive amendment' of

the indictment after evidence to include an aiding and abetting instruction and the court's

aiding and abetting instructions that were, Wall contends, unreasonable and confusing.

He also thinks counsel should have objected to the prosecution's closing on this score.

In his 'affidavit' Wall further asserts that his attorney prejudiced his defense when

he requested an instruction that "the evidence establishes beyond a reasonable doubt that

the use of that cocaine played a significant causal role in bringing about the death of

Loretta Fortin."  In Wall's view the United States was "required to prove beyond a

reasonable doubt that the cocaine 'caused' death in and of itself."  Instead, the instruction

given "allowed jurors to contemplate/deliberate whether cocaine in conjunction with

controlled substances brought about the demise of Ms. Fortin."  Wall complains that the

instruction given allowed the jury to deliberate on the cumulative effects of the cocaine

rather than specifically on whether death resulted from Fortin's ingestion of cocaine as

charged.  He opines that jurors do not parse instructions the way that lawyers do but will

view the instructions contextually and use common sense, giving the word "causal" an

everyday meaning.  Wall feels like this lowered the standard of proof to below that of

beyond a reasonable doubt.  Wall cites the testimony of the Deputy Chief Medical

Examiner that the cause of death was multiple drug overdose of which cocaine was the

most lethal drug.  Wall contends that this means it was impossible for cocaine to be found

as the sole cause of the death. [20]

> The First Circuit addressed the jury instructions on Wall's direct appeal:
>
>> Appellant makes a multi-pronged attack on the court's charge to the jury on the causal relationship between his alleged distribution of cocaine and Fortin's death. The court instructed the jury as follows:
>>
>>> And I instruct you that for you to find that Loretta Fortin's death resulted from the use of cocaine that the defendant distributed, you must find that the government has proven beyond a reasonable doubt that Loretta Fortin died as a consequence of her use of the cocaine that the defendant distributed on or about the dates alleged in the indictment. I instruct you that you must find the evidence establishes beyond a reasonable doubt that the use of that cocaine played a significant causal role in bringing about the death of Loretta Fortin.
>>>
>>> And I instruct you that the government does not have to prove that Loretta Fortin's death from the use of the cocaine was foreseeable for the defendant or for the others.
>>
>> Appellant contends that this charge suffered from three specific flaws: first, although he specifically requested the "significant causal role" language, he now claims that this instruction understated the government's burden of proof; second, he contends that the court should have instructed the jurors that, to convict him, they needed to find that there was no intervening or superseding cause of death; and, finally, he asserts that the wording of the instruction in effect required the jury to find causation. Appellant additionally argues that his trial counsel's acquiescence to the causation instructions constituted ineffective assistance of counsel and thus was a Sixth Amendment violation.
>>
>> We briefly address the asserted flaws below, but note at the outset that neither the claims of instructional error nor the ineffective assistance claim are properly before us. The causation charge as given by the trial judge was requested and specifically approved by defense counsel. Indeed, at a sidebar conference held after the jury charge, counsel twice confirmed

---

[20]    In his response to the United States, Wall sets this ground off as a straight-up challenge to the jury charge, noting the contest concerning the proper instruction at the time of trial.  However, the First Circuit has already ruled on such a challenge so I treat this claim as originally presented by Wall as an ineffective assistance claim.

upon inquiry from the judge that he had "[n]o objection and no additional requests." Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal. See United States v. Mitchell, 85 F.3d 800, 807 (1st Cir.1996) (discussing difference between "waiver" and "forfeiture" and noting that only the latter is subject to plain error review).

The claim of ineffective assistance of counsel, meanwhile, runs up against our longstanding rule that "fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court," United States v. Mala, 7 F.3d 1058, 1063 (1st Cir.1993); see also United States v. Martinez-Vargas, 321 F.3d 245, 251 (1st Cir.2003). Appellant argues that this case is unusual and worthy of consideration at this juncture because there was "no possible tactical reason" for trial counsel to request the "significant causal role" language, and the record is thus sufficiently developed to permit effective review. See Mala, 7 F.3d at 1063. We disagree, believing, as our discussion below indicates, that a tactical reason exists, and that this case, like most, would thus benefit from the trial court's perspective on the attorney's performance and its impact. See id. In any event, our discussion infra of appellant's specific instructional complaints strongly suggests that, were we to reach the issue of counsel's competence, we inevitably would find no constitutional error.

Turning to appellant's specific complaints, we first address his claim that the court diluted the government's burden of proof by asking the jury to determine whether cocaine that he distributed "played a significant causal role in bringing about the death of Loretta Fortin." Under the statute, an enhanced sentence must be imposed on a defendant who commits a drug offense "if death or serious bodily injury results from the use of such substance," 21 U.S.C. § 841(b)(1)(C). We have described the necessary proof to be that "a defendant deals drugs and a user of those drugs dies as a result," United States v. Soler, 275 F.3d 146, 153 (1st Cir.2002). Both the statute and our precedent thus link the jury's finding simply to whether death was a result of the offense; an instruction requiring jurors to find a "significant" causal relationship suggests a higher, rather than lower, burden of proof. Even if we were to review for plain error, therefore, appellant's contention would be unavailing.

We easily can dispose of appellant's second complaint about this portion of the instruction, which is that the opening words, "I instruct you that you must find" directed the jurors to reach the conclusion contained in the second part of the sentence, i.e., that "the evidence establishes beyond a reasonable doubt that the use of that cocaine played a significant causal role in bringing about the death of Loretta Fortin." In context, it is clear that the court was advising the jurors that, in order to convict, they needed to conclude beyond a reasonable doubt that the evidence supported the specified causal relationship.

Appellant's remaining point, that the court improperly omitted an intervening cause instruction, also merits little response. Although he points to the other drugs and alcohol ingested by Fortin, appellant identifies no evidence in the record that would permit a conclusion that another substance, rather than cocaine, was responsible for her death. The medical examiner testified that, in his opinion, the level of cocaine in Fortin's system was enough by itself to kill her. He further stated that none of the other substances she had consumed was at a level sufficient to cause her death, and it was "very unlikely" that death would have resulted from only the combination of alcohol, codeine and valium. On this record, the failure to give an intervening cause instruction was not plain error.

Wall, 349 F.3d at 23- 25.

Nothing in Wall's 28 U.S.C. § 2255 pleadings would lead me to revisit the propriety of the instructions.  If the instructions are proper under the law it cannot be said that counsel delivered inadequate representation by not objecting.  I note one proviso to this conclusion: the First Circuit did indicate that it could benefit from the trial court's perspective on the attorney's performance and its impact.

With respect to the aiding and abetting aspect of this Court's instruction (See Sept. 11, 2001, Tr. Vol. II at 322-24):

An instruction on aiding and abetting may be given although there is no reference to the crime in the indictment. United States v. Footman, 215 F.3d 145, 154 (1st Cir.2000). Indeed, a charge of aiding and abetting is implicit in indictments for substantive offenses. Ibid. The revisor's note to 18 U.S.C. § 2 states that "one who puts in motion or assists in the illegal enterprise ... is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense."

United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003).

**11.     Failing to ask for jury sequestering or new trial in view of the September 11, 2001, attacks**

Wall was being tried on September 11, 2001, when "United States was attacked." Wall notes that the Court dismissed the jury on learning of the attack and they were not called back for two days.  He feels like this prejudiced him because it is so "well known

that money from drug proceeds supports terrorists."  He faults his attorney for not making a proper motion for sequestering or for a new trial. [21]

As the United States points out, sequestering the jury – either with or without an explanation of the attacks -- would have been an inappropriate response to the events of September 11, 2001.  Similarly, if counsel had asked for Wall's case to be dismissed in view of these events, I am confident that this Court would have rejected such a motion outright.  No more need be said on this claim.

### 12.    Failing to object to partial read back of medical examiner/toxicology testimony

The jury's note upon which this claim stands stated that the jurors needed, "a transcript of the testimony of the medical examiner and the toxicologist."  (Sept. 11, 2001, Tr. Vol. II  at 347.)  In chambers with counsel the court indicated:

> What I propose to do, [the Court Reporter] tells me that she would have to review this testimony very carefully especially the toxicologist, there are a lot of technical terms.  What I propose to do is send them back a response to this and explain to them how we have to do it and I'm going to dictate this and we'll talk about any part of it.
> Madam foreperson.  In response to your most recent note please be advised there is no written transcript of the testimony of the witnesses in question.
> The production of such a transcript would be a very time consuming process.
> The method that we follow in such cases is to have the jury brought to the courtroom and the court reporter reads back the portion of [a] witness'[s] testimony asked for by the jury.
> This too can be a time consuming process.
> It is customary for the jury to rely, to the extent that it can, on its recollection of the testimony as given during trial. To the extent that you wish to follow the forgoing procedure I ask that you specify with as much exactness as possible the portion of testimony of each of these two witnesses, the medical examiner and toxicologist, which the jury wishes to hear again.

---

[21]    In his 'affidavit' Wall connects this ground with his ground faulting counsel for not objecting when the Court decided not to read back the medical examiner's testimony.  I believe his theory is that the attacks preoccupied the jury and distracted them from this key testimony.

(Id. at 347-48.)[22]  Both attorneys indicated that this was satisfactory.  (Id. at 349.)  Ten minutes later the jury returned a note which read: "We agree to continue deliberations using our recollection."  (Id. at 350.)

Counsel, Wall now argues, should have objected to this reaction to the note on the theory that this testimony went to the heart of whether the death was not caused by cocaine alone.  The testimony that Wall focuses on is when his counsel cross-examined the medical examiner:

> Q.      The combination of this alcohol is in cocaine, is it fair to say it is pretty lethal?
> A.      No, it is not a fair statement to say that they have to be lethal, and that the concentrations – I have seen concentrations of higher that had other clear causes of death and I have seen lower levels that were, again, cocaine or cocaine by-products.
> Q.      What was your opinion as far as what was the cause of death?  You said it earlier[;] I believe it was a combination of all of these drugs?
> A.      I take into account all of the drugs, it was acute multiple drug poisoning.
> Q.      Which means she had other drugs and [the prosecutor] was asking you questions about toxicology reports, this is the toxicology report you got from Pennsylvania and this is the report you based your opinion on; correct?
> A.      Yes.
> Q.      A combination of multiple drugs?
> A.      Yes sir?
> Q.      You don't know how the interaction or how long she had taken these drugs before?  All of these are variables that you don't know.  You don't know her past medical history.  All you know are about the autopsy report and the toxicology report and that is what you are basing your opinion on?
> A.      And the clinical information.  I would not base it strictly on a report[;] I would also want clinical information.
> Q.      And what is the clinical information?

---

[22]      I have manipulated the transcript here to incorporate an addition to the Court's response added after the initial dictation.

> A.      The information from the emergency room as to how long this had been and what they saw and the investigation as far as what was seen or what was her history.
> Q.      So, it's a combination of the autopsy, the material from Pennsylvania and the clinical information and based upon that you came to your definition of the fact that she died of multiple drugs in her system?
> A.      Yes.

(Sept. 11, 2001, Trial Tr. Vol. III at 51-52.)  And when defense counsel re-crossed the examiner:

> Q.      Doctor, you indicated that [the cocaine] may have caused the death.  Cocaine alone, that is not what you said is the cause of death, it's multi drug; is that correct?
> A.      Yes.
> Q.      [The prosecutor] kept trying to indicate cocaine alone would be enough to have killed this particular victim but you don't know that for sure?  It may have added additional toxicity?
> A.      Well, I think the other things added additional toxicity.  Most important was cocaine by the other things, not obviously but I believe added additional toxicity.
> Q.      Exactly.  The alcohol, factors of the heart – so what you're saying, so there is no mistake, she died from multi drugs in her system, period?
> A.      That is my conclusion, yes sir.

(Id. at 56.)  Wall believes this testimony establishes his actual innocence of the charge that he distributed cocaine that resulted in the death of Fortin because the cause of her death was "multiple drug poisoning" and cocaine in isolation cannot be the agent from which death resulted.

The First Circuit has,

> long and repeatedly held that rereading testimony during jury deliberations rests in the presider's sound discretion. See, e.g., Argentine, 814 F.2d [783,] 787 [(1st Cir. 1987)]; United States v. George, 752 F.2d 749, 757 (1st Cir.1985); United States v. Hyson, 721 F.2d 856, 865 (1st Cir.1983); United States v. Pimental, 645 F.2d 85, 87 (1st Cir.1981); United States v. Almonte, 594 F.2d 261, 265 (1st Cir.1979). The factors the judge should consider in responding to a jury's expressed desire to rehear testimony include whether the request is "reasonably well-focused," whether there is any "physical or logistical impairment to reading" the testimony back, and

38

the amount of time the procedure would probably consume. <u>Argentine</u>,
814 F.2d at 787. In a nutshell, the judge must weigh the reasonableness of
the request, the ease or difficulty in compliance, and what is likely to be
gained or lost.

<u>United States v. Akitoye</u>, 923 F.2d 221, 226 (1st Cir. 1991). It is evident to me that this

Court soundly exercised its discretion in making its determination regarding how to best

respond to the jury's query. Accordingly, it was not ineffective for counsel to refrain

from insisting that the court reporter read back testimony that, now transcribed, fills fifty-

five pages.

**13. Failing to inform the court that Wall was heavily medicated during the two trials and failing to investigate impact of medication on the outcome of the trial**

Wall faults his attorney for not informing the Court that he was heavily medicated

during his two trials. He also complains that counsel never investigated the impact that

this over-medication had on the trial outcomes. He says that the United States Marshal

was even giving him valiums in front of the juries. In his addendum Wall notes that the

only time his medication was brought up with the court was during Wall's July 12, 2001,

competency hearing at which point Wall indicated that he was not hallucinating because

he was on medication. According to Wall, after this hearing the doctors at the

Cumberland County Jail changed his medications a few more times and sometimes, Wall

claims, did not even know what was going on at his trials. He states that Cumberland

County Jail has rebuffed his efforts to get a list of the medications that he was on at the

time. He told his attorney of his efforts to get this information and his attorney did not do

anything.[23]

---

[23]     The United States has not responded to this ground.

Wall has nowhere in his voluminous pleadings explained how his medicated state actually led to a violation of his constitutional trial rights. Furthermore, his arguments made here vis-à-vis his other §2255 grounds demonstrate that he was actually attentive to the testimony of witnesses and was interacting with counsel as to what he should question witnesses about. The fact that he was on medications alone does not violate trial rights. Indeed, the testimony at the competency hearing demonstrates that it was necessary for Wall to be on medications. And of course, this Court can rely on its own observations of Wall during trial when deciding this 28 U.S.C. § 2255 claim. See McGill, 11 F.3d at 225 (observing that, when, a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing").

### B.   *Prosecutorial Misconduct for Failing to Disclose*

Wall believes that the prosecutor "blatantly lied to defense counsel at sidebar when defense asked about a suppression hearing and the prosecutor said that 'there was no motion to suppress any of this,' a statement to which the court agreed." Wall does not identify when this bench conference he refers to occurred. I could find no bench conference during Griffin's testimony. The United States cites page 103 of the transcripts of the cocaine trial at which point Officer Richard Gagne is testifying. The transcripts reveal the prosecutor offering a copy of an identification card with the name Mitchell Wall and an address of 62 High Street, apartment Number 2, Biddeford, Maine. (Sept. 11, 2001, Tr. Vol. I at 102.) The officer indicated that the card came from Wall's apartment at 61 High Street. (Id.) Defense counsel asked for a conference at sidebar at

which juncture he stated, "[A]pparently there was a motion to suppress downstairs in front of the Magistrate with another attorney ....  I want to have a continuous objection to all of those things [being] admitted." (Id. at 102-03.)  The prosecutor indicated: "The motion to suppress was only relating to a statement that Mr. Wall made to Griffin in the jail.  There was no motion to suppress any of this." (Id. at 103.)  Defense counsel suggested that Wall had told him that it was related to the current evidence. (Id.)  The prosecutor correctly indicated that there was no other motion to suppress and defense counsel withdrew the objection. (Id.)  It is evident that there simply was no misrepresentation by the prosecutor.

In a separate ground Wall complains that the prosecution withheld reports during the suppression hearing of the interviews of Jeannine Larson, William Shrout, and John Bennett, which would have proven that Griffin was investigating Fortin's death while working with the government.  The report appears to be Wall's Exhibit F to Wall's 'affidavit' which is an investigative report dated October 4, 1999, portions of which are marked by Wall.[24]

In his response to the United States' opposition, Wall indicates that this non-utilized report claim is not premised on the United States' failure to disclose the information but on his attorney's failure to give Wall a copy of the investigative report containing the impeachment fodder.

---

[24]    The United States asserts that this exhibit bears a sticker "Defendant's Exhibit 8" which suggests that it was admitted in a court proceeding.  It then references the transcript of the suppression hearing and states that Defendant's Exhibit 8 was identified in the cover sheet as an investigative report (but which is really described there as a "proffer sheet") and that at the hearing Agent Deetjen was cross examined about it.  But, that cross-examination seems to pertain to a proffer statement prepared by an agent named Hafener. (Jan. 17, 2001, Tr. at 70.)  The Court's copy of this exhibit does not have a defense exhibit attached.

Assuming that Wall is still pressing this as a prosecutorial misconduct claim, as the First Circuit observed vis-à-vis Wall's direct appeal: "Under Brady [v. Maryland, 373 U.S. 83, 83 (1963)], the government is required 'to produce to defendants exculpatory and impeachment evidence that is in its custody, possession, and control,'" Wall 349 F.3d at 22 n.6 (quoting United States v. Josleyn, 206 F.3d 144, 151 (1st Cir. 2000)).  Under Brady, "a defendant must show both that the evidence is material and that there is a 'reasonable probability' that it would produce an acquittal upon retrial." Id. at 22 (citing Josleyn, 206 F.3d at 151).  "These two elements are really two sides of the same coin"; "evidence is 'material' in the Brady context 'only if there is a "reasonable probability" that the evidence would have changed the result.'" Id. at 22 n.7 (quoting Josleyn, 206 F.3d at 151).  I conclude that, assuming counsel did not have this exhibit during Wall's prosecution, that there is not a reasonable probability that the use of this report at trial would produce an acquittal upon retrial.

**C.      *Selective Prosecution by the Government***

On his claim of selective prosecution, Wall,

> "bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'"

United States v. Union Nacional de Trabajadores, 576 F.2d 388, 395 (1st Cir. 1978) (quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974)).

Wall complains that Leach admitted to paying the kids, shooting Loretta Fortin up, and even distributing; Fortier admitted that he got cocaine that night and shared it

with Fortin, Wall, Leach, and Powers, which is an admission to distribution; Powers admitted that he bought cocaine directly from the 'kids' and shared, which is distribution; and Griffin, who was not there, even said that others shared the cocaine.  Wall, on the other hand, denied obtaining, distributing, or sharing the cocaine yet he was prosecuted.

In his addendum Wall argues that the prosecution selected to link a chain of events to one person.  As to the involvement of the other parties, Wall relays that on September 3 and 4, 1999, Debra Leach and Loretta Fortin were riding around looking for cocaine.  Leach paged "the kids' and other people trying to find cocaine. Leach and Fortin ran into Fortier at a bar trying to find cocaine.  Leach called Wall in Portland trying to see if he wanted to party, although they were actually looking for cocaine.  Leach, Fortier, Fortin, and Wall congregated at Wall's apartment in Biddeford, Maine.   Wall tried to get cocaine but his source was out so he returned to the house with Fortier's money.  The 'kids' showed up at Wall's house with cocaine and apologized to Leach (as opposed to Wall) for not showing up earlier.  Fortin, Wall, and Leach got cocaine from Fortier. Fortin, Leach, Fortier, and Wall got cocaine from Powers.  The only testimony that anyone received cocaine directly from Wall was from Fortier who testified that he could not remember much.  And Powers admitted he bought cocaine directly from 'the kids' and that Powers and Fortier pooled money and bought directly off 'the kid' (contradicting Fortier).  Wall states that if it was not for Leach looking for cocaine all day, providing transportation, looking for people to buy it, and paging 'the kids,' Fortin would be alive today.  Yet, Wall complains, the prosecution linked all of this to Wall.

The United States responds by pointing out that Leach received a seventeen-month sentence and Griffin a twenty-four month sentence and that neither of these two

were similarly situated to Wall as both entered guilty pleas and cooperated, including

testifying at Wall's trial.  It states that Fortier and Powers were not charged with federal

crimes but they too cooperated by testifying at Wall's trial.  As the United States points

out the United States Sentencing Guideline § 5K2.0 and Federal Rule of Criminal

Procedure 35 expressly permit this manner of favorable treatment for individuals who

cooperate with the prosecution.

**D.** **_Conviction was Obtained by the Use of Evidence Gained Pursuant to an Unconstitutional Search and Seizure_**

In a straight-up version of one of his ineffective assistance claims, Wall argues

that the detectives conducting the search of Wall's house did so without a warrant as the

search was conducted on September 4, 1999, but the judge and the detective both signed

the warrant for September 5, 1999.  As I stated with respect to the ineffective assistance

claim, (see supra Section A.8) there is no reason for a court to treat the incorrect dates on

the warrant – promptly and formally amended -- as invalidating the September 4 search,

see White, 356 F.3d at 869; McKenzie, 446 F.2d at 954;  cf. Bonner, 808 F.2d at 866, and

Wall has pointed to no evidence for the proposition that the warrant was actually obtained

after the search was conducted, McGill, 11 F.3d at 225.

**E.** **_Booker_ and _Shepard_ Claims**

Finally, in his addendum Wall states that he would like to raise a Blakely v.

Washington, 542 U.S. 296 (2004)/ United States v. Booker, __ U.S. __, 125 S. Ct. 738

(Jan. 12, 2005)[25] claim apropos his sentencing enhancements on his Oxycontin case.[26]

---

[25]     Wall actually calls it "Phan-Pahn" which is a reference to Fanfan, the companion case to Booker from this District.  The cases resulted in one decision cited as Booker.

[26]     As noted above, there was some discussion of the need to prove up the prior conviction under Apprendi during the pre-trial conference of counsel on the cocaine charge.  Defense counsel did not want the information being fleshed out in front of the jury.

Wall did not raise a claim based on the <u>Blakely</u> and <u>Booker</u> predecessor, <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).  The First Circuit "held that petitions under 28 U.S.C. § 2255 are unavailable to advance <u>Booker</u> claims in the absence of a Supreme Court decision rendering <u>Booker</u> retroactive." <u>United States v. Fraser</u>, 407 F.3d 9, 11 (1st Cir. 2005)(citing <u>Cirilo-Munoz v. United States</u>, 404 F.3d 527 (1st Cir. 2005)).  <u>See also</u> <u>id.</u> ("[W]e have said there is nothing fundamentally unfair in the use of judge-made findings of fact." <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir.2005)").

The United States Supreme Court held in <u>Shepard v. United States,</u>

> that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.

__ U.S. __,125 S. Ct. 1254, *1263 (2005).  Wall claims that <u>Shepard</u> invalidates the court's reliance on prior felonies that Wall contends, without explication, were not violent. Wall offers no basis for this Court to even analyze his predicate burglaries under the <u>Shepard</u> rule.   Furthermore, while there is yet to be a decision by a Circuit Court of Appeals on the question, there is a growing chorus in the District Courts that <u>Shepard</u>, like <u>Booker</u>, is a new procedural rule that is not retroactive to cases on collateral review. <u>See</u> <u>Darco v. United States</u>, No. CV-04-1378 (CPS), 2005 WL 1804475, *4 (E.D.N.Y. Jul 28, 2005) (collecting District Court cases); <u>see</u> <u>also</u> <u>Caballero-Banda v. Unite States</u>, No. EP-05-CA-0330-DB, EP-01-CR-1404-DB, 2005 WL 2240226, *5 (Sept. 13, 2005, W.D.Tex.) (W.D.Tex. 2005) (Briones, J.) ;<u>McCleskey v. United States</u>, No. EP-05-CA-0272-PRM, EP-03-CR-1038-PRM, 2005 WL 1958407, *6 (W.D.Tex. Aug. 15,  2005) (Martinez, Dist. J.).

*Conclusion*

For the reasons given above I **DENY** Wall's motion to stay and recommend that the Court **DENY** Wall's 28 U.S.C. § 2255 motion in its entirety.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

September 30, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge